IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 1, 2022

**IN RE SCARLETT F.**

**Appeal from the Chancery Court for Madison County**
**No. 78535     James F. Butler, Chancellor**

**No. W2021-01292-COA-R3-PT**

A mother appeals the trial court's decision to terminate her parental rights based on the grounds of (1) substantial noncompliance with the permanency plans, (2) persistence of conditions, (3) severe child abuse, and (4) failure to manifest an ability and willingness to personally assume custody or financial responsibility of the child. She further challenges the trial court's finding by clear and convincing evidence that termination of her parental rights was in the best interest of the child. We vacate the substantial noncompliance ground and reverse the persistence of conditions and failure to manifest an ability and willingness to assume custody or financial responsibility grounds. Concluding that the record does not contain clear and convincing proof that termination is in the best interest of the child, we reverse the trial court's order terminating the mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Vacated in Part, Affirmed in Part, Reversed in Part, and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY and KENNY W. ARMSTRONG, JJ., joined.

Bob C. Hooper, Brownsville, Tennessee, for the appellant, Tara F.

Lanis L. Karnes and Jennifer Coats Covellis, Jackson, Tennessee, for the appellees, Kevin A. and Renae A.

John Andrew Anderson, Lexington, Tennessee, guardian ad litem.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

This case involves the termination of Tara F.'s ("Mother") parental rights to her daughter, Scarlett F. (born in 2017). Mother has a lengthy history of substance abuse that began as early as age seventeen. Over a twenty-year period, she entered numerous drug detox and/or rehabilitation facilities but usually failed to remain sober longer than a year. Her struggles with substance abuse resulted in the Tennessee Department of Children's Services ("DCS" or "the Department") removing her two older children, Brian (born in 2005) and Caleb (born in 2011), from her custody; both children were adopted by relatives before Scarlett's birth.

While still pregnant with Scarlett, Mother lived at a rehabilitation facility called Renewal House and was prescribed buprenorphine to treat her addiction to opioids. Because this prescription was used as part of Mother's treatment program, the child was born addicted to buprenorphine and had to stay in the hospital for thirty days to "wean off it slowly." Once the child was released from the hospital, Mother returned to Renewal House, and she was permitted to keep the child with her there while continuing substance abuse treatment. Mother remained at Renewal House until the child was fourteen months old. Then, near the end of April 2018, someone found a pack of cigarettes and a crack pipe in the child's stroller. Mother claimed that the paraphernalia was not hers, and she claimed that her drug screens from before and after the incident proved that the paraphernalia was not hers because she tested negative for illegal substances. Nevertheless, the facility asked her to leave.

Upon leaving Renewal House, Mother moved into her grandmother's home and began using drugs again within approximately six weeks. The Department became involved on July 3, 2018, after receiving a report that the child was exposed to drugs. Mother admitted to DCS that she used heroin on a daily basis, and she submitted to a drug screen that returned positive for cocaine, morphine, and buprenorphine. During this investigation, DCS's investigator noticed that the child had a significant diaper rash and took her to the hospital where the child was treated with a medicated ointment. The Madison County juvenile court entered a protective custody order removing the child from Mother's custody and placing her in the temporary legal custody of DCS on July 10, 2018. The court then strongly admonished Mother "to immediately enter a facility to detox." After initially refusing to enter the detox facility, Mother eventually acquiesced only to leave the facility within twenty-four hours against medical advice.

Approximately a month after the removal, a hair follicle drug screen was performed on the child, and it returned positive for cocaine and benzoylecgonine. The child's positive drug screen prompted DCS to file a petition for dependency and neglect that the juvenile court heard on October 2, 2018. In an order entered on November 15, 2018, the juvenile

court adjudicated the child dependent and neglected and found that, by exposing the child to drugs, Mother committed severe child abuse as defined by Tenn. Code Ann. § 37-1-102. The court then ordered that the child remain in DCS custody. The Department placed the child in the home of Kevin A. and Renae A. (collectively, "Foster Parents"), where she has stayed continuously throughout these proceedings.

After the child was removed from Mother's custody, DCS developed an initial permanency plan on July 25, 2018, which the juvenile court ratified on August 7, 2018. At first, Mother made no progress towards completing the requirements[1] of this plan because shortly after its creation Mother was arrested for stealing guns and other valuables from her grandmother as well as for writing bad checks on an account belonging to her grandmother. She remained in jail for the next four months, but she was released in January 2019 when the charges against her were dropped due to her grandmother's death. Immediately upon release from jail, Mother entered a one-year inpatient substance abuse treatment program at Hope Recovery Center/Women of Hope ("Women of Hope"). While Mother was in the one-year program at Women of Hope, DCS created two more permanency plans that were each ratified by the juvenile court. In the ratification orders for those permanency plans, the court found that Mother had made limited progress towards satisfying the plans' requirements because she still needed to complete the inpatient treatment program.

On November 20, 2019, less than two months before Mother was scheduled to graduate from Women of Hope, Foster Parents filed in the Madison County chancery court a petition seeking to terminate Mother's parental rights and to adopt the child. Prior to the filing of the termination petition, Mother regularly attended four hours of supervised visitation per month that had been permitted by the juvenile court. After filing an answer and completing the year-long program at Women of Hope in January 2020, Mother filed a motion requesting an increase in visitation. The chancery court denied the motion and, sua sponte, suspended all visitation stating that it was the court's general policy to suspend all visitation upon the filing of a termination petition.

The trial for Foster Parents' termination petition began on August 24, 2020. However, due to no fault of Mother, the chancery court continued subsequent days of proof,[2] and the trial did not conclude until June 1, 2021. Because the trial was not completed in the time frame initially expected by the court, Mother filed a motion in October 2020 requesting that the court reconsider the suspension of Mother's visitation

---

[1] The specific requirements for this permanency plan and each subsequent permanency plan will be addressed later in this opinion.

[2] Originally, the second day of trial was scheduled for September 29, 2020, but it had to be rescheduled for November 6 and 13, 2020, due to Foster Parents and one of their attorneys possibly being exposed to COVID-19. The court rescheduled the matter for January 5 and 6, 2021, because one of Foster Parents' attorneys underwent surgery. Finally, the court postponed the January 2021 trial dates due to the Supreme Court's COVID-19 order suspending in-person court proceedings.

rights. The court denied the motion. Therefore, when the trial concluded, Mother had not been allowed to visit with the child in over a year.

Once the trial concluded, the chancery court entered an order terminating Mother's parental rights. The court determined that Foster Parents proved by clear and convincing evidence the following grounds for termination: (1) substantial noncompliance with the requirements of the permanency plans, (2) persistence of conditions, (3) severe child abuse, and (4) failure to demonstrate an ability and willingness to assume custody or financial responsibility. The court further determined that there was clear and convincing evidence that termination of Mother's parental rights was in the best interest of the child.

Mother appealed and presents the following issues for our review: (1) whether the chancery court erred in not dismissing Foster Parents' termination petition based on the equitable doctrine of unclean hands, (2) whether the chancery court abused its discretion in suspending Mother's visitation rights while the termination petition was pending, (3) whether the chancery court erred in finding by clear and convincing evidence that Mother substantially failed to comply with the requirements of the permanency plans, and (4) whether the chancery court erred in determining that termination of her parental rights was in the best interest of the child.

STANDARD OF REVIEW

Under both the federal and state constitutions, a parent has a fundamental right to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 249-50 (Tenn. 2010) (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)). Although this right is fundamental, it is not absolute and may be terminated in certain situations. *In re Angela E.*, 303 S.W.3d at 250. Our legislature has identified "'those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B., IV.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)).

Tennessee Code Annotated section 36-1-113 provides the grounds and procedures for terminating parental rights. First, a petitioner seeking to terminate parental rights must prove that at least one ground for termination exists. Tenn. Code Ann. § 36-1-113(c)(1); *In re Angela E.*, 303 S.W.3d at 251. Second, a petitioner must prove that terminating parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

The termination of a parent's rights is one of the most serious decisions courts make because "[t]erminating parental rights has the legal effect of reducing the parent to the role of a complete stranger," *In re W.B., IV*, 2005 WL 1021618, at *6, "and of 'severing forever all legal rights and obligations of the parent or guardian.'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(l)(1)). Consequently, a parent has a constitutional right to fundamentally fair procedures during termination proceedings. *In re Hannah C.*, No. M2016-02052-COA-R3-PT, 2018 WL 558522, at *2 (Tenn. Ct. App. Jan. 24, 2018) (citing *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016)).

Tennessee law ensures fundamental fairness in termination proceedings by requiring a heightened standard of proof—clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re Carrington H.*, 483 S.W.3d at 522. Before a parent's rights may be terminated, a petitioner must prove both the grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d at 546. "Clear and convincing evidence 'establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Serenity B.*, No. M2013-02685-COA-R3-PT, 2014 WL 2168553, at *2 (Tenn. Ct. App. May 21, 2014) (quoting *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004)).

We review the trial court's findings of fact de novo with a presumption of correctness unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *In re Serenity B.*, 2014 WL 2168553, at *2. In light of the heightened standard of proof, we must then make our own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)).

ANALYSIS

I. Equitable doctrine of unclean hands.

Mother first contends that the chancery court should have dismissed Foster Parents' termination petition pursuant to the equitable maxim of unclean hands, which provides that "'he who comes into a court of equity, asking its interposition in his behalf, must come with clean hands.'" *In re Mattie L.*, 618 S.W.3d 335, 344 (Tenn. 2021) (quoting *C.F. Simmons Med. Co. v. Mansfield Drug Co.*, 23 S.W. 165, 168 (Tenn. 1893)). The maxim "protects the integrity of the court, ensuring that any claimant whose requested 'relief grows out of or depends upon or is inseparably connected with his own prior fraud . . . will be repelled at the threshold of the court.'" *Id.* (quoting *Fuller v. Cmty. Nat'l Bank*, No. E2018-02023-COA-R3-CV, --- S.W.3d ----, ----, 2020 WL 1485696, at *5 (Tenn. Ct. App. Mar. 27, 2020)).

In becoming a foster home, Foster Parents entered into a contract with DCS whereby they agreed not to "petition to adopt, obtain guardianship, or file for custody of [a] child/youth in the care of DCS, unless [DCS] concurs with the plan and gives written approval." There is no dispute that DCS neither concurred in Foster Parents' plan nor gave approval to their petition to terminate Mother's parental rights.[3] Thus, Mother asserts, the Foster Parents' petition is "inseparably connected" to a prior fraud and the maxim of unclean hands should bar them from bringing this action.

Mother's argument fails to take into account two important considerations that govern the applicability of the doctrine of unclean hands. First, our Supreme Court has held that "[t]he doctrine applies only to parties who seek an equitable remedy from a court." *In re Mattie L.*, 618 S.W.3d at 344-45. Foster Parents did not request equitable relief from the chancery court. Rather, they petitioned the court for statutory relief pursuant to Tenn. Code Ann. § 36-1-113. Second, the maxim "is limited to 'misconduct connected with the particular matter in litigation; and does not extend to any misconduct, however gross, which is unconnected therewith, and with which [the opposing party] is not concerned.'" *Id.* at 345 (quoting *Chappell v. Dawson*, 308 S.W.2d 420, 421 (Tenn. 1957)); *see also* Henry R. Gibson & William H. Inman, *Gibson's Suits in Chancery* § 18 (7th ed. 1988). In other words, the doctrine of unclean hands traditionally

> applies to facts involving only two parties, plaintiff and defendant, and one transaction involving both parties. . . . General impropriety and misconduct that is not directed at the other party or that is tangential to the transaction at issue is insufficient to give rise to a defense under the doctrine of unclean hands.

27A AM. JUR. 2D *Equity* § 25 (2022) (footnotes omitted).

The misconduct Mother complains of concerns whether Foster Parents breached a contract they entered into with DCS—a third party. If Foster Parents breached the contract with DCS, their misconduct (the breach) would have been directed at DCS not Mother. Therefore, at best, Foster Parents' misconduct was collateral or tangential to the issue of whether Mother's parental rights should be terminated. Based on the foregoing, we conclude that the doctrine of unclean hands does not bar Foster Parents' termination petition.

---

[3] On the first day of trial, an attorney for DCS appeared and stated that he was there to "inform the court that the Department of Children's Services is taking a neutral position on this TPR, and [DCS is] not going to actively participate."

II.  Suspension of Mother's visitation.

Mother next asserts that the chancery court abused its discretion in suspending her visitation rights.  After Mother entered the Women of Hope treatment program in 2019, the juvenile court ordered that she be allowed supervised visitation with the child for four hours per month.  She consistently attended the scheduled visits until the middle of 2020. The individuals supervising the visits did not report any inappropriate behavior by Mother during any of the visits, and neither DCS nor Foster Parents requested the visits cease due to any concerns.  Nonetheless, on July 6, 2020, the chancery court ordered that all visitation between Mother and the child cease pending resolution of Foster Parents' termination petition because it was "the Court's policy"[4] to suspend visitation once a termination petition is filed.

Because decisions regarding custody and visitation are fact-specific and require consideration of several factors, trial court's have broad discretion to make such decisions. *Armbrister v. Armbrister*, 414 S.W.3d 685, 693 (Tenn. 2013).  Therefore, appellate courts decline to reverse a trial court's custody or visitation decision absent an abuse of discretion. *Id.*  A court abuses is discretion when it "appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011).

Mother argues that the chancery court's decision constituted an abuse of discretion because the court should have reviewed the visitation issue in light of the particular circumstances of this case rather than simply applying a general policy.  The termination statute, Tenn. Code Ann. § 36-1-113, provides that decisions to terminate a parent's parental rights must consider the best interest of the child, but the statute provides no guidance regarding what, if anything, a court should consider when making visitation decisions if a termination petition is pending.  We find some guidance on this issue in Title 37, however, which, among other things, governs juveniles in foster care.  Throughout Title 37, trial courts and DCS are directed to make decisions that are in the best interest of the child.  *See* Tenn. Code Ann. §§ 37-1-166(d)(3) (stating that, before ordering a child enter DCS custody, a court must consider "all the facts and circumstances presented" and determine whether "[c]ontinuation of the child's custody with the parent or legal guardian is contrary to the best interests of the child"); 37-2-403(a)(3) (providing that, when reviewing the requirements of a permanency plan, a court shall approve the permanency plan "if the court finds it to be in the best interest of the child"); 37-5-602(a) (directing DCS that "[w]henever possible, preservation of the family should serve as the framework for services, but, in any case, the best interests of the child shall be paramount").  If a court has entered an order relating to visitation, Tenn. Code Ann. § 37-1-139(b)(1) provides that

---

[4] The chancery court made no reference to a written policy or local rule supporting this statement, and the parties do not assert that any such written policy or local rule exists.

the order, "[e]xcept for an order terminating parental rights or an order of dismissal, . . . may be changed or modified . . . [u]pon a finding of changed circumstances and that the change or modification is in the best interest of the child[.]"  This language is similar to that found in Tenn. Code Ann. § 36-6-101(2)(C) which governs modifications of prior orders relating to visitation for custodial and non-custodial parents and states as follows: "If the issue before the court is a modification of the court's prior decree pertaining to a [visitation] schedule, then the petitioner must prove by a preponderance of the evidence a material change of circumstance affecting the child's best interest."  Thus, custody and visitation decisions usually must be based on what is in the child's best interest under the circumstances of a particular case.

Tennessee Code Annotated section 36-6-106, a statute governing child custody, provides that, "[i]n a suit for annulment, divorce, separate maintenance, *or in any other proceeding requiring the court to make a custody determination regarding a minor child*, the determination shall be made on the basis of the best interest of the child."  Tenn. Code Ann. § 36-6-106(a) (emphasis added).  Removal and termination proceedings require courts to make custody determinations regarding minor children.  Ergo, the child's best interest is also paramount in such proceedings.

Once a court determines it is in the child's best interest to be removed from a parent's custody, the parent is the equivalent of a non-custodial parent in a traditional parental custody case.  "Tennessee courts have recognized that non-custodial parents have a fundamental right to visitation." *Brewster v. Brewster*, No. M2000-01174-COA-R3-CV, 2001 WL 401600, at *3 (Tenn. Ct. App. Apr. 23, 2001) (citing *Helson v. Cyrus*, 989 S.W.2d 704, 707 (Tenn. Ct. App. 1993)).  Thus, once a child has been removed from a parent's custody, "the court shall, upon request of the noncustodial parent, grant such rights of visitation as will enable the child and the noncustodial parent to maintain a parent-child relationship unless the court finds, after a hearing, that visitation is likely to endanger the child's physical or emotional health."  Tenn. Code Ann. § 36-6-301.  But, "the non-custodial parent's right of visitation may be limited or denied where there exists definite evidence that visitation would threaten the child." *Brewster*, 2001 WL 401600, at *3 (citing *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988)); *see also* Tenn. Code Ann. § 36-6-301.  As we have explained:

> Because of the legal and psychological significance of a parent's visitation rights, persons seeking to restrict or eliminate visitation must demonstrate that there is probable cause that the child will be placed at risk if visitation is permitted.  The Tennessee Supreme Court requires that this proof must be "definite," and Tenn. Code Ann. § 36-6-301 requires that the proof demonstrate that visitation is "likely to endanger the child's physical or emotional health. . . .
>
> With these principles in mind, the courts have terminated or suspended visitation by a non-custodial parent only in extreme circumstances

such as (1) the non-custodial parent's history of physically abusing his spouse and child; (2) the non-custodial parent's abandonment of the child; or (3) conduct of the non-custodial parent that is injurious to the child's physical health. In other circumstances, the courts have stopped short of terminating or suspending visitation when less restrictive alternatives, such as supervised visitation, have been reasonably available.

*Wix v. Wix*, No. M2000-00230-COA-R3-CV, 2001 WL 219700, at *11 (Tenn. Ct. App. Mar. 7, 2001) (citations omitted); *see also Brewster*, 2001 WL 401600, at *3.

Although not expressly stated, prior cases involving suspension of a parent's visitation rights in either a dependency and neglect or a termination of parental rights setting have applied the foregoing principles rather than simply instituting a general policy disallowing visitation. *See In re Brian W.*, No. M2020-00172-COA-R3-PT, 2020 WL 6390132, at *1 (Tenn. Ct. App. Oct. 30, 2020) (involving a trial court that suspended parents' visitation due to concerns about the children's welfare because parents failed to comply with the permanency plan addressing their significant neglect of the children); *In re La'Trianna W.*, No. E2016-01322-COA-R3-PT, 2016 WL 7175288, at *1 (Tenn. Ct. App. Dec. 9, 2016) (involving a trial court that suspended a father's supervised visitation, upon DCS's request, because he had a history of abusing the child's mother and the child was "terrified" of him); *In re Kalob S.*, No. E2014-02016-COA-R3-PT, 2015 WL 4736029, at *2 (Tenn. Ct. App. June 12, 2015) (involving a trial court that suspended a father's visitation after he tested positive for illegal substances and stopped attending visits).

In deciding to suspend Mother's visitation rights, the chancery court concluded it was appropriate to cease visitation because that was "the Court's policy," not because it found that any of the above circumstances existed. Indeed, the evidence in the record before this court indicates that no such circumstance existed and that supervised visitation was reasonably available as a less restrictive alternative as it is undisputed that Mother had been consistently attending supervised visits with the child before and after Foster Parents filed the termination petition. We, therefore, conclude that the chancery court abused its discretion in suspending Mother's visitation rights. We do not believe this constitutes reversible error, but we will take it into consideration in analyzing the grounds for termination and the best interest factors.

III. Grounds for termination.

    A. Substantial noncompliance[5]

---

[5] Generally, this is a termination ground relied upon by DCS, but a private party, such as Foster Parents, may also rely on it in situations where the child was placed in DCS protective custody and where DCS developed a proper permanency plan. *In re Michael W.*, No. E2019-00107-COA-R3-PT, 2020 WL 405473,

We turn now to the grounds for termination relied on by the chancery court. First, the court terminated Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(2), which provides that a parent's rights may be terminated where "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4." To succeed under this ground, a petitioner must "demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656. Conditions that make foster care placement necessary may "include conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547. The court must then determine whether the noncompliance is substantial. *In re M.J.B.*, 140 S.W.3d at 656. In assessing a parent's substantial noncompliance with a permanency plan, the court should measure "both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d at 656.

During the two and half years following the removal, DCS created six permanency plans: July 25, 2018; January 24, 2019; July 8, 2019; January 2, 2020; June 29, 2020; and December 28, 2020. The first permanency plan required Mother to do the following: (1) complete inpatient treatment and follow recommendations, (2) complete random drug screens, (3) complete a mental health assessment with an alcohol and drug component and follow recommendations, (4) obtain legal income and housing for at least four months, and (5) attend supervised visits with the child. The second, third, and fourth permanency plans, were created after Mother entered Women of Hope, and they added the following requirements: (1) continue services through Women of Hope and find a stable home and income after completing the program, (2) complete a psychological assessment with a parenting component and follow recommendations, and (3) complete parenting classes. The final two plans were created after the filing of the termination petition and after Mother successfully completed the treatment program at Women of Hope. These plans added no new requirements.

The juvenile court ratified all six plans and found that the requirements of all of them were reasonable and related to remedying the condition that necessitated foster care for the child—Mother's substance abuse issue. We agree with the juvenile court and note that the last two plans expressly stated that Mother had completed all of the requirements. We further note that, in ratifying the last two plans, the juvenile court acknowledged that Mother was in compliance with the permanency plans but stated that the court "only ha[d]

at *8 (Tenn. Ct. App. Jan. 23, 2020) (citing *In re Kaleb N.F.*, No. M2012-00881-COA-R3-PT, 2013 WL 1087561, at *21 (Tenn. Ct. App. Mar. 12, 2013); *In re Kah'nyia J.*, No. M2017-00712-COA-R3-PT, 2018 WL 2025217, at *8 (Tenn. Ct. App. Apr. 30, 2018)). In the present case, the child was placed in DCS custody, and the record contains several permanency plans created by DCS. Therefore, Foster Parents may rely on this termination ground.

jurisdiction to ratify" the permanency plans due to Foster Parents' termination petition pending in the chancery court.

If the record contains evidence showing Mother was in compliance with the permanency plans, on what basis did the chancery court conclude that Foster Parents proved this ground by clear and convincing evidence? After a thorough examination of the chancery court's order terminating Mother's parental rights, the answer to that question remains a mystery because the court failed to make any findings of fact with respect to this ground. Tennessee Code Annotated section 36-1-113(k) requires a trial court to "enter an order which makes specific findings of fact and conclusions of law" in all termination of parental rights cases. If a trial court fails to comply with this requirement, we usually must remand the case for preparation of the necessary findings of fact and conclusions of law. *State v. McBee*, No. M2003-01326-COA-R3-PT, 2004 WL 239759, at *6 (Tenn. Ct. App. Feb. 9, 2004). However, we have previously declined to remand for reconsideration when we affirmed both the existence of other grounds for termination and the trial court's best interest determination. *In re Abbigail C.*, No. E2015-00964-COA-R3-PT, 2015 WL 6164956, at *14 (Tenn. Ct. App. Oct. 21, 2015). This case differs from *In re Abbigail C.* in that, although we determine at least one other ground for termination exits, we reverse the chancery court's best interest determination. Nevertheless, as in *In re Abbigail C.*, we decline to remand for further findings because our determination that the record lacks clear and convincing evidence that termination is the child's best interest makes further findings on this ground unnecessary. The chancery court's decision regarding this termination ground is, therefore, vacated.

B. Persistence of conditions.[6]

The chancery court also terminated Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3). This ground is often referred to as "persistence of conditions" and allows courts to terminate parental rights in situations where:

> The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> > (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the

---

[6]On appeal, Mother challenges only the chancery court's determination that clear and convincing evidence existed to establish the substantial noncompliance ground. Nevertheless, we must review each ground relied upon by the chancery court for terminating her parental rights. *See In re Carrington H.*, 483 S.W.3d at 525.

child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

(iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3)(A). A petitioner seeking to terminate parental rights pursuant to this ground must prove each of the statutory elements by clear and convincing evidence. *In re Justin D.*, No. E2019-00589-COA-R3-PT, 2020 WL 4473032, at *9 (Tenn. Ct. App. Aug. 4, 2020) (citing *In re Michael B.*, No. M2019-01486-COA-R3-PT, 2020 WL 2988932, at *10 (Tenn. Ct. App. June 4, 2020)).

The persistence of conditions ground "focuse[s] on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *In re Audrey S.*, 182 S.W.3d at 874. The purpose behind this ground for termination is "'to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child.'" *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)). Therefore, the question we must answer is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

Here, there is no dispute that the child was removed from Mother's custody by a protective custody order and then adjudicated dependent and neglected more than six months before the termination hearing began. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)-(B). There is also no dispute that the child was removed from Mother's custody due to drug exposure. In the two years following the removal, Mother made tremendous efforts to demonstrate that the child could be safely returned to her custody by completing all of the permanency plans' requirements. She entered the intensive inpatient treatment program at Women of Hope, and a year later, she successfully completed the program. Since entering Women of Hope, Mother has submitted to numerous drug screens and all of them returned negative for drugs. At the time of trial, she had been sober for over two years.

When the child entered DCS custody, there were some concerns about Mother's mental health because, at some point in her past, she was diagnosed as bipolar. Mother

- 12 -

admitted that she no longer took medication to treat her bipolar diagnosis and explained that she needed to avoid bipolar medication, if possible, due to her lengthy history with substance abuse. Mother stated that she regularly attended counseling, and the counselor monitored her to determine whether she needed to resume taking medication for her bipolar condition. As of trial, the counselor did not believe medication was necessary because Mother had not had an episode in over two years. Tashyra Williams, one of the DCS caseworkers involved in this case, testified that she believed Mother addressed the mental health concerns by completing a psychological assessment and then regularly attending counseling sessions as recommended by the assessment.

After graduating from the treatment program, Mother obtained employment and housing through her rehabilitation community. Ms. Williams testified that she visited Mother's apartment and determined that it was appropriate. Indeed, Ms. Williams stated that, prior to Foster Parents filing the termination petition, DCS believed Mother was progressing so well that it began discussing increasing her visitation to unsupervised and potentially doing a trial home visit[7] once she graduated from Women of Hope. Mother's significant progress indicated that the conditions necessitating foster care would be remedied at an early date and that the child could be returned to her in the near future.

The chancery court acknowledged that Mother "has done fairly well in her most recent rehabilitation and post rehabilitation setting." But, the court determined "other conditions" persisted that prevented the safe return of the child to Mother's custody because Mother had not progressed to unsupervised visits with the child. Thus, the court concluded, any bonding between Mother and the child was "minimal," and "return[ing] the child to [Mother] and the loss of the family unit she had adapted to at [Foster Parents'] home in light of the child's history, would cause the child to regress and be re-traumatized and mentally damaged." From this language, it appears that the chancery court confused this ground with other termination grounds. Although losing Foster Parents' "family unit" may be traumatic for the child, it does not establish that, "in all reasonable probability," Mother would subject the child "to further abuse or neglect." Tenn. Code Ann. § 36-1-113(g)(3)(A)(i). The chancery court failed to focus on Mother's efforts at improvement. *See In re Audrey S.*, 182 S.W.3d at 874. Focusing on Mother's efforts at improvement, we emphasize that Ms. Williams testified that Mother was doing well and that DCS was discussing increasing Mother's visitation to unsupervised when the termination petition was filed. Ms. Williams stated that Mother was beginning to establish a bond with the child, but the chancery court then improperly suspended all visitation and prevented Mother from further solidifying a bond with the child. In other words, the "minimal" bonding was not the result of Mother's efforts. It was the result of the court's actions. Therefore, we conclude that the "minimal" bond between Mother and child does not

---

[7] Ms. Williams explained that "[a] visit is when you see [the child] for a time frame," whereas a trial home visit is "[w]hen the child goes home and lives with the parent."

establish that "in all reasonable probability . . . the child [would] be subject to further abuse or neglect." Tenn. Code Ann. § 36-1-113(3)(A)(i).

Based on the foregoing, we conclude that Foster Parents failed to prove by clear and convincing evidence the first two elements of this ground: (1) that conditions persisted (2) that would not be remedied at an early date so the child could be safely returned to Mother in the near future. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)-(B). We reverse the chancery court's decision regarding this termination ground.

C. Severe child abuse.

The chancery court also terminated Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(4), which states:

> The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

As relevant here, Tenn. Code Ann. § 37-1-102(27) defines "severe abuse" as:

> (E) Knowingly or with gross negligence allowing a child under eight (8) years of age to ingest an illegal substance or a controlled substance that results in the child testing positive on a drug screen, except as legally prescribed to the child; or
> (F) Knowingly allowing a child to be within a structure where any of the following controlled substances are present and accessible to the child:
>     (i) Any Schedule I controlled substance listed in § 39-17-406;
>     (ii) Cocaine;
>     (iii) Methamphetamine; or
>     (iv) Fentanyl[.]

On November 15, 2018, the juvenile court entered an order adjudicating the child dependent and neglected and finding that she was the victim of severe child abuse perpetrated by Mother. She did not appeal the juvenile court's order and does not dispute the severe abuse finding. Because the juvenile court's severe abuse finding in the November 15, 2018 order satisfies the " under any prior order of a court" language in Tenn. Code Ann. § 36-1-113(g)(4), we conclude that the chancery court properly determined that Foster Parents proved this ground for termination by clear and convincing evidence.

- 14 -

D. Failure to manifest an ability and willingness to personally assume custody.

Finally, the trial court terminated Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(14). This ground requires a party to prove two elements by clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1), (g)(14). First, a party must prove that the parent failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). Second, a party must prove that placing the children in the parent's "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14).

To establish the first prong, the party seeking to terminate parental rights need only prove that a parent failed to manifest either an ability or a willingness to assume custody. *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020) (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13-14 (Tenn. Ct. App. June 20, 2018)). "Ability focuses on the parent's lifestyle and circumstances[,]" and willingness focuses on the parent's attempts "to overcome the obstacles that prevent [him or her] from assuming custody or financial responsibility for the child." *In re Serenity W.*, No. E2018-00460-COA-R3-PT, 2019 WL 511387, at *6 (Tenn. Ct. App. Feb. 8, 2019). Thus, a parent's mere desire to reunite with his or her child is insufficient to demonstrate an ability or a willingness. *In re Nicholas C.*, No. E2019-00165-COA-R3-PT, 2019 WL 3074070, at *17 (Tenn. Ct. App. July 15, 2019). A parent must demonstrate ability and/or willingness as of the date the termination petition was filed. *In re M.E.N.J.*, No. E2017-01074-COA-R3-PT, 2017 WL 6603658, at *7 (Tenn. Ct. App. Dec. 27, 2017).

At the time the termination petition was filed, Mother's actions demonstrated a willingness to assume custody and financial responsibility for the child. She consistently attended the scheduled supervised visits with the child until the chancery court improperly suspended her visitation rights. She had been sober and receiving intensive inpatient treatment at Women of Hope for nearly a year. In fact, she was scheduled to graduate from Women of Hope's program in less than two months when Foster Parents filed the termination petition. Mother also obtained employment through Women of Hope and began paying child support shortly before the petition was filed. However, we must conclude that she failed to demonstrate an ability to assume custody of the child because, at the time the petition was filed, she had not obtained appropriate housing for the child as she had not yet graduated from Women of Hope.

Under the circumstances of this case, the second prong of the analysis presents us with a more challenging determination. The chancery court concluded that Foster Parents proved by clear and convincing evidence that returning the child to Mother "would pose a risk of substantial harm to [her] physical or psychological welfare." In reaching this conclusion, the court relied heavily on the testimony of Dr. Patti van Eys, a clinical psychologist, who testified on behalf of Foster Parents. The court certified Dr. van Eys as

- 15 -

an expert on bonding and parenting capacity. Dr. van Eys conducted a bonding assessment between the child and Foster Parents by observing them for twenty-one hours. Based on the assessment, Dr. van Eys concluded that the child was "extremely bonded" with Foster Parents and their two adopted children. Mother did not participate in the bonding assessment but, relying on information provided by Foster Parents and the maternal grandparents, Dr. van Eys concluded that "there [was] not a meaningful relationship at this point in time with [the child] and [Mother]." Thus, Dr. van Eys opined, "it would be a traumatic loss for [the child] to lose [Foster Parents] and to lose [their adopted children]."

Dr. van Eys's opinion on this issue causes this Court concern, but the record contains evidence that we find even more disturbing and leads us to question how much weight should be given to Dr. van Eys's opinion. For example, the record contains evidence that the foster mother interfered with Mother's ability to form a meaningful bond with the child. Melissa Brown, one of the supervisors for the visits between Mother and the child, testified that the foster mother insisted on remaining in the room with the child during the first four or five visits. Thus, the child often gravitated towards the foster mother during those visits rather than forming a bond with Mother. Mother stated that she did not object to the foster mother staying for those visits if it helped the child, but Ms. Brown and the other supervisor for the visits eventually insisted that the foster mother not remain in the room during the visits because it was not conducive to the therapeutic visitation. Even more disturbing, Ms. Brown stated that she was unsure whether the child actually knew she was visiting her mother because the child was so young when she was removed from Mother's custody and the foster mother repeatedly told the child during the visits to "tell your friend this, show your friend that." Indeed, the foster mother admitted that the child "didn't know who her mom was because she was told that [Mother] was a friend."

Despite this interference, the DCS caseworker, Ms. Williams, and the visitation supervisors testified that Mother was beginning to develop a bond with the child when the chancery court improperly suspended Mother's visitation rights. Moreover, when asked if Mother could develop a meaningful relationship with the child, Dr. van Eys responded that "[i]t likely would depend on could [the child] still have access to [Foster Parents] as extended family." Mother acknowledged the bond between the child and Foster Parents and stated that she had no intention of barring Foster Parents from the child's life. She was adamant that she was "more than willing for them to be [the child's] family, too."

In forming her opinion that the child would be traumatized by losing Foster Parents, Dr. van Eys relied on the child's behavioral problems she observed in three video recordings taken during a phone call with Mother, a videoconference visit with Mother, and a car ride to an in-person visit with Mother. In the videos, the child is heard crying and appears unsettled. According to Dr. van Eys, these behaviors constituted "disregulated" behavior where "the child's brain is just in kind of a threat mode, so they're not feeling safe, and they're just kind of pure emotion and not thinking." The foster mother recorded those videos, however, and she admitted during her testimony that each video

- 16 -

recorded only about thirteen minutes of the child's behavior and that the child's behavior did ultimately calm down. Furthermore, Ms. Williams and the supervisors of the visits testified that they did not observe the child acting "disregulated" during the visits, but rather, observed her interacting with Mother and enjoying the visits.

Finally, in concluding that the child would be traumatized if placed with Mother, Dr. van Eys relied on her assessment that the child exhibited signs of numerous adverse childhood experiences ("ACEs"). She stated that the child's higher number of ACEs meant there was a higher risk "for psychosocial problems, like depression, anxiety, PTSD, problems like substance abuse, smoking, obesity, health conditions like COPD, [and] heart disease" because they create "more toxic stress" in the child's "little developing brain self." In making this assessment, she relied on a belief that the child suffered "profound neglect" the first sixteen months of her life. However, the record contains evidence that the child did not in fact suffer profound neglect for the first sixteen months of her life. Specifically, Mother testified that she and the child lived in the Renewal House rehabilitation facility for the first fourteen months of the child's life. Mother admitted to suffering from postpartum depression after giving birth but stated she still properly cared for the child and that the child was happy. Mother's friend, Clarkie Graham, who testified on behalf of Foster Parents, corroborated Mother's testimony. She visited Mother and the child at Renewal House several times and described the child as "very adjusted. She was very relaxed. . . . Everything was okay." Ms. Graham did not observe signs of neglect until after Mother left Renewal House, approximately two months before the child's removal. Thus, although Mother certainly neglected the child for two months and that behavior must not be condoned, the record indicates that Dr. van Eys based her opinion on inaccurate information. We, therefore, conclude that Dr. van Eys's testimony on the topic of "profound neglect," while certainly relevant, should not be given significant weight.

Based on the foregoing evidence, we cannot conclude that Foster Parents proved the second prong by clear and convincing evidence. We acknowledge that we have previously held that the second prong may be satisfied by opinion testimony that: (1) concerns existed that a child would be at risk for psychological harm if placed with a parent with whom he or she had no meaningful bond with because the parent made little to no effort to form a bond and (2) that the child exhibited behavioral problems related to visitations with a parent. *See In re Terry E.*, No. E2020-01572-COA-R3-PT, 2021 WL 3438567, at *10 (Tenn. Ct. App. Aug. 6, 2021). However, this case is significantly different because Mother attempted to develop a meaningful bond with the child, but her attempts were wrongly impeded by other people, and the basis of the opinion testimony regarding a risk of psychological harm was contradicted by other evidence in the record. Therefore, under this set of facts, we must conclude that the trial court erred in determining that Foster Parents proved this termination ground by clear and convincing evidence.

III.  Best interest.

Having determined that clear and convincing evidence of at least one statutory ground exists to terminate Mother's parental rights, we must next consider whether the trial court properly determined that termination of Mother's parental rights was in the best interest of the children.  *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860.  After a court finds that clear and convincing evidence exists to support a ground for termination, the child's interests diverge from those of the parent and the court focuses on the child's best interests.  *In re Audrey S.*, 182 S.W.3d at 877.  A court must view the child's best interest from the perspective of the child, not that of the parent.  *Id.* at 878.  A finding that at least one ground for termination of parental rights exists does not necessarily require that a parent's rights be terminated.  *Id.* at 877.  Because some parental misconduct is redeemable, our termination of parental rights statutes recognize that "terminating an unfit parent's parental rights is not always in the child's best interests."  *Id.*  The facts a court considers in its best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence."  *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. Ct. App. Tenn. 2015).  Once a court makes the underlying factual findings, it should "consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest."  *Id.*

When considering whether terminating a parent's rights to a child is in the child's best interest, a trial court must consider the factors enumerated in Tenn. Code Ann. § 36-1-113(i).[8]  A trial court is not required to find that each of the enumerated factors exists before concluding that it is in the best interest of the child to terminate a parent's rights.  *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005).  Although in some circumstances "the consideration of one factor may very well dictate the outcome of the analysis," *In re Audrey S.*, 182 S.W.3d at 878, a court is still obligated to consider "all the factors and all the proof."  *In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017).

Mother contends that the case should be remanded to the chancery court because the court failed to make sufficient findings of fact regarding its best interest analysis.  Specifically, Mother argues that the court failed to identify the best interest factors it considered applicable or to state how its factual findings applied to the best interest factors.  As discussed above, Tenn. Code Ann. § 36-1-113(k) requires trial courts to make "specific findings of fact and conclusions of law" in termination cases, and, in certain circumstances,

---

[8] The Tennessee General Assembly amended the statutory best-interest factors in 2021.  *See* 2021 TENN. PUB. ACTS ch. 190 § 1 (S.B. 205), eff. April 22, 2021.  However, the factors applicable to this appeal are the nine factors identified in Tenn. Code Ann. § 36-1-113(i) (2020), which were in effect when the termination petition was filed on July 16, 2020.  *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017) (holding the version of a termination statute "'that was in force when the petition was filed governs this case'") (quoting *In re Tianna B.*, No. E2015-02189-COA-R3-PT, 2016 WL 3729386, at *7 (Tenn. Ct. App. July 6, 2016)) .

we must remand the case if the trial court failed to prepare appropriate written findings of fact or conclusions of law. *See In re B.L.R.*, No. W2004-02636-COA-R3-PT, 2005 WL 1842502, at *14-15 (Tenn. Ct. App. Aug. 4, 2005). A thorough review of the chancery court's order terminating Mother's parental rights shows that Mother is correct that the court failed to cite to the statutory best interest factors. However, the failure to cite to the statutory factors is not always fatal to a termination order. We have held that "'[a] judgment in a termination case will not be set aside if it can be reasonably inferred from the opinion or order that the decision was based on the statutory requirements.'" *In re Michael R.O., Jr.*, No. W2011-02488-COA-R3-PT, 2012 WL 1884699, at *10 (Tenn. Ct. App. May 24, 2012) (quoting *In re Jeremy D.*, No. 01-A-01-9510-JV00479, 1996 WL 257495, at *3 (Tenn. Ct. App. May 17, 1996)). The chancery court made numerous factual findings in its best interest analysis, and those findings are specific enough that it can be reasonably inferred from the order that the court based its decision on factors one, two, four, and five. We, therefore, conclude that the findings are sufficient to afford reasonable appellate review.

Having found that the chancery court's order provides sufficient findings of fact, we turn to address whether Foster Parents proved by clear and convincing evidence that termination of Mother's parental rights was in the child's best interest. As for the first best interest factor, several witnesses testified that Mother "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent." Tenn. Code Ann. § 36-1-113(i)(1). Ms. Williams explained that Mother had completed all of the recommended substance abuse treatment, had not tested positive for any illegal substances in over two years, had obtained stable and safe housing, and had cooperated with DCS and complied with the permanency plans. Indeed, Ms. Williams stated that DCS never started a referral to terminate Mother's parental rights because Mother "was complying with the task[s] that we had on the plan." Marcie Hendrick, the executive director of Women of Hope, testified that Mother obtained employment as her secretary shortly before Mother graduated from the treatment program and that Mother continued to work for her over a year later. The maternal grandmother initially testified on the first day of trial on behalf of Foster Parents and stated that she did not believe Mother would remain sober because she had a history of relapsing. For various reasons, the remaining days of trial did not occur until approximately a year later and, when trial resumed, the maternal grandmother returned to the stand but on behalf of Mother. The maternal grandmother stated that, since previously testifying, her opinion had changed and that Mother had "become the daughter [she] never dreamed [she'd] have." The maternal grandmother explained that, when she nearly died from COVID-19 in October 2020, Mother "stepped up" to take care of her and "ran my household." The maternal grandfather corroborated this testimony stating that Mother "took care of the house for [them]" during the maternal grandmother's illness. He said that Mother also "did most of the taking care of" for Caleb, Mother's son whom the maternal grandparents had adopted. Mother insured Caleb made it to school and helped him with homework. Despite the pressure created by the maternal grandmother's illness, Mother remained sober, and the maternal grandfather

stated that he "totally trust[ed]" Mother to care for Caleb. He explained that the only reason they had not returned custody of Caleb to Mother was as follows:

> I'm old enough to draw social security, and so since we adopted Caleb, he can draw social security, so we're putting back about $1,200 a month for his education. It has nothing to do with trust. It has something to do with finances.

This factor weights against terminating Mother's parental rights.

The chancery court placed great weight on the second best interest factor which focuses on a parent's potential for lasting change by examining "[w]hether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible." *Id.* § 36-1-113(i)(2). The Department made reasonable efforts to assist Mother in effecting a lasting adjustment by creating several permanency plans, assisting her in obtaining the services necessary to complete the plans' requirements, and scheduling visits with the child. Again, Ms. Williams testified that Mother cooperated with DCS and complied with all of DCS's requirements. Mother stated that she had been sober for over two years, and the results of numerous drugs screens she had submitted to over a two-year period supported her testimony. The chancery court acknowledged this evidence of Mother's continued sobriety but concluded she had failed to make a lasting adjustment because Dr. van Eys testified "that relapse for [Mother] is probable" and because Mother "would not interview with Dr. van Eys, that fact must be taken into consideration." We disagree with the chancery court's findings for two reasons. First, neither DCS nor any previous order of the court required Mother to submit to a bonding assessment with Dr. van Eys or anyone else. Foster Parents filed a motion requesting the chancery court to order Mother to submit to the bonding assessment with Dr. van Eys, but the court denied that motion. Second, our Supreme Court has found that "the risk that [a parent] may relapse is a possibility only and does not amount to clear and convincing evidence" that termination is in the best interest of the child. *In re Gabriella D.*, 531 S.W.3d at 686. We, therefore, conclude that this factor does not weigh in favor of termination.

The third best interest factor considers whether the parent maintained regular visitation with the child. *See id.* § 36-1-113(i)(3). Ms. Williams testified that Mother consistently attended in-person supervised visits with the child between May and December 2019 and then regularly visited with the child via videoconferences when DCS began limiting in-person visits due to the COVID-19 pandemic. As explained above, Mother attempted to increase her visitation, but the chancery court arbitrarily denied any continued visitation when Foster Parents filed the termination petition. This factor weighs against termination of Mother's parental rights.

- 20 -

Next, the chancery court found that a meaningful relationship did not exist between Mother and the child. *See id.* § 36-1-113(i)(4). As discussed above, Dr. van Eys believed there was no meaningful relationship between Mother and the child, but the foster mother interfered with Mother's efforts to establish a meaningful relationship with the child by leading the child to believe that Mother was merely a friend and by insisting on staying in the room during several of the visits. Despite the interference, however, witnesses testified that Mother was forming a bond with the child. When the supervised visitation began in May 2019, Ms. Williams stated that "there was an awkward stage where [the child] was still trying to get to know [Mother], but by June, the end of June, [the child] would come in, they would hug, and they would play. . . .[T]hey were building a bond to know one another." Ms. Brown also testified that the child was hesitant when meeting Mother at the first visit but the bond increased over time. In fact, in December 2019, Ms. Brown observed the child "thr[o]w a fit to stay instead of leaving the visits." Then, in January 2021, the chancery court arbitrarily suspended Mother's visitation rights halting any further efforts for her to strengthen the growing bond with the child. We conclude that this factor weighs in favor of termination but only very slightly.

Regarding the fifth best interest factor—"[t]he effect of a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition"—the record contains evidence indicating that removing the child from Foster Parents would have a negative effect on her. Dr. van Eys testified that the child was bonded to Foster Parents and their adopted children and that removing the child from Foster Parents would be a significant loss for her. Dr. van Eys further testified that removing the child from Foster Parents would cause the child severe trauma and mental damage. However, the record contains evidence that Dr. van Eys based her opinion on inaccurate information about the first sixteen months of the child's life. The faulty premise of Dr. van Eys's opinion substantially negates this factor.

The sixth best interest factor considers "[w]hether the parent, or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household." *Id.* § 36-1-113(i)(6). As the chancery court found, the child was born with drugs in her system because Mother received buprenorphine to treat her drug addiction. Additionally, when the child was approximately sixteen months old, Mother exposed the child to drugs, and a hair follicle test performed on the child one month following the removal returned positive for cocaine and benzoylecgonine. Thus, Mother did in fact abuse the child by exposure to drugs. This weighs in favor of termination. However, by the time of trial, Mother had been sober for over two years and had fully complied with the conditions DCS imposed for regaining custody of the child; this change affects how we view this factor.

Factor seven considers whether there is criminal activity in the home and whether a parent is often unable to care for a child due to substance abuse. *Id.* § 36-1-113(i)(7). Ms.

- 21 -

Williams testified that she visited Mother's apartment and found that it was "healthy and safe." Foster Parents offered no proof that Mother had relapsed to abusing drugs. All the proof indicated that Mother had not failed a drug screen in more than two years even though she had been drug tested numerous times. Foster Parents' proof focused on the fact that Mother admitted to spending three or four nights a week at her parents' home rather than at her apartment because she was assisting her parents while her mother recovered from complications caused by COVID-19. However, Foster Parents offered no proof that the maternal grandparents' home was unhealthy or unsafe. We consider it to be a positive that Mother has reestablished a relationship with her parents. That relationship broadens the support system for Mother and the child. This factor weighs against termination of Mother's parental rights.

Factor eight focuses on a parent's mental or emotional status. *See id.* § 36-1-113(i)(8). Mother admitted that, in the past, she had been diagnosed with bipolar disorder. She explained that she had not taken medication for that diagnosis in over two years, but she stated that she regularly attended counseling and that the counselor did not recommend that she take bipolar medication because she had not experienced any bipolar episodes in two years. This factor is neutral.

Lastly, factor nine considers whether a parent has paid child support. *Id.* § 36-1-113(i)(9). Shortly before graduating from Women of Hope, Mother obtained employment and began paying child support. The proof indicated that, at the time of trial, she was not in arrears with her child support payments. This factor does not favor termination.

The proof in this record shows that Mother has accomplished something rarely seen in parental termination cases—she established that "[n]ot all parental misconduct is irredeemable." *In re Audrey S.*, 182 S.W.3d at 877. Mother has worked with DCS and completed all the tasks the permanency plans required of her. She received treatment for a long-established drug addiction and has remained drug free for over two years after completing that treatment. She has reestablished relationships with her parents and one of her other children. However, while Mother was seeking treatment, the child established a significant bond with Foster Parents and their two adopted children. We acknowledge that Dr. van Eys opined that the child could suffer trauma if removed from Foster Parents, but the record contains evidence showing that Dr. van Eys formed that opinion by relying on inaccurate information about the child's first sixteen months of life. It is clear that Foster Parents love the child, but we cannot condone the foster mother's interference with Mother's attempt to bond with the child or the chancery court's improper suspension of Mother's visitation rights. Thus, we are unable to conclude that the combined weight of the proven facts amounts to clear and convincing evidence that termination of Mother's parental rights is in the best interest of the child.

By so holding, we note that it does not mean that Mother immediately regains custody of the child or that she will ever regain custody. It merely means that Foster Parents failed to meet their burden of proof. As our Supreme Court has explained:

> [W]e do not at all condone or excuse the conduct that resulted in the removal of [this child] from Mother's custody. . . . And we certainly do not minimize the genuine concern and affection Foster Parents have for [this child]. Our decision instead results from an objective and comprehensive review of the record to determine whether the facts presented satisfy the constitutionally mandated heightened standard of proof. This heightened standard is designed specifically to reduce the risk of erroneous decisions depriving parents of their precious and fundamental rights to the care and custody of children. In this case, this heightened standard of proof was not satisfied. We recognize that the result in this case is unusual, but this is an unusual case. Too often parents fail to rehabilitate themselves and make the changes needed to avoid losing their parental rights forever. The proof in this record establishes that Mother has been able to make the necessary adjustments. This is precisely how the system is designed to function. Should Mother revert to the reprehensible conduct that started the process that culminates with this decision, DCS will have the option of filing a termination petition, as the circuit court's finding of severe abuse has not been disturbed on appeal. Tenn. Code Ann. § 36-1-113(g)(4).

*In re Gabriella D.*, 531 S.W.3d at 686.

## CONCLUSION

We vacate the chancery court's determination that clear and convincing evidence existed to establish the ground of substantial noncompliance with the requirements of the permanency plans. We reverse the chancery court's determination that Foster Parents proved by clear and convincing evidence the grounds of persistence of conditions and failure to demonstrate an ability and willingness to assume custody or financial responsibility of the child, but we affirm the court's determination that the ground of severe abuse was proven by clear and convincing evidence. Because Foster Parents failed to prove by clear and convincing evidence that termination was in the child's best interest, we reverse the chancery court's order terminating Mother's parental rights. The case is remanded to the chancery court for entry of an order dismissing Foster Parents' termination petition. Costs of this appeal are assessed against the appellees, Kevin A. and Renae A., for which execution may issue if necessary.

_/s/ *Andy D. Bennett*_____
ANDY D. BENNETT, JUDGE